Michelle M. Meyers (SBN 236387)
Lisa J. Nicholes (SBN 242852)
Carmela S. Birnbaum (SBN 190495)
John R. Ternieden (SBN 330343)
Jordan A. Goulet (SBN 364645)
**SINGLETON SCHREIBER, LLP**
1414 K Street, Suite 300
Sacramento, CA 95814
Phone: (916) 248-8478
Facsimile: (619) 255-1515
Email:mmeyers@singletonschreiber.com
lnicholes@singletonschreiber.com
cbirnbaum@singletonschreiber.com
jternieden@singletonschreiber.com
jgoulet@singletonschreiber.com
insurance.service@singletonschreiber.com

Attorneys for Plaintiffs ELLEN RIPPBERGER and ERICK STURM

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ELLEN RIPPBERGER, individually and as Co-Trustee of THE STURM-RIPPBERGER TRUST; and ERICK STURM, individually and as Co-Trustee of THE STURM-RIPPBERGER TRUST<br><br>Plaintiffs,<br><br>v.<br><br>THE TRAVELERS INDEMNITY COMPANY, a Connecticut corporation; THE STANDARD FIRE INSURANCE COMPANY, a Connecticut corporation, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.<br><br>Unlimited Jurisdiction<br><br>**VERIFIED COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs ELLEN RIPPBERGER ("Rippberger") and ERICK STURM ("Sturm") (Rippberger and Sturm are refered to collectively herein as the "Plaintiffs"), individually and as co-trustees of The Sturm-Rippberger Trust ("Trust"), by and through undersigned counsel, bring this Verified Complaint for Damages and Demand for Jury Trial ("Complaint") and hereby file suit against Defendant THE TRAVELERS INDEMNITY COMPANY ("Travelers Company"); Defendant THE STANDARD FIRE INSURANCE

COMPANY ("Standard Fire") (Travelers Company and Standard Fire are referred to collectively as "Travelers"); and Defendant DOES 1 through 10 ("Doe Defendants") (all Defendants referred to herein collectively as "Defendants") and allege based on personal knowledge as to the acts and events taking place or upon information and belief as to all other acts as follows below.

## INTRODUCTION

1. When disaster struck Los Angeles County in January 2025 during the Palisades and Eaton Fires, Travelers' policyholders whose houses remained standing, yet were left unsafe and uninhabitable by toxic fire-related smoke and ash infiltration, turned to Travelers for the benefits they paid for and were promised.

2. Travelers is one of the largest private homeowner's insurers in California and Los Angeles County, and it markets itself as the insurer that "has got you covered every day and when it matters most."[1]




3. Travelers promises its homeowners insurance policyholders "peace of mind with a claims process that is simple and stress-free."[2]

---

[1] Travelers, https://www.travelers.com/ (last viewed 8/25/2026).

[2] Travelers, Homeowners Insurance, Home Insurance Coverage, Homeowners Insurance FAQs, *Why should I choose Travelers?*, available at https://www.travelers.com/home-insurance/faqs (last viewed 8/25/2026).

**Why should I choose Travelers?** ^

> Choosing a homeowners insurance policy starts with choosing the right insurance company. Travelers has been one of the nation's leading and largest property casualty companies for over 170 years. We offer a variety of policy options and packages to help you get the coverage that meets your unique needs. We can provide you with information to help protect the place you call home. Travelers gives you peace of mind with a claims process that is simple and stress-free.

4. Pursuant to its policies and California law, Travelers was obligated to provide policyholders like Plaintiffs with prompt, fair coverage that would restore their homes to a safe, livable condition.

5. But instead of honoring its legal obligations and its promise to be there "when it matters most" with a "simple and stress-free" claims process, Travelers compounded the harm of its policyholders. Since the January 2025 Fires, Travelers has turned its back on its insureds and engaged in a widespread, systemic, and unlawful troubling pattern of claims handling practices.

6. As part of this unlawful scheme, Travelers has engaged in at least the following illegal pattern and practice of wrongful claims handling:

- Slow and inadequate investigation of claims;
- Underpayment of claims;
- A lack of reasonable standards for prompt investigation and processing claims, including in regard to smoke damage; and/or
- Delayed or inadequate communication with policyholders.

7. Plaintiffs are insured by Travelers and were harmed by Travelers' unlawful pattern and practice of mishandling claims.

8. While Plaintiffs' home located at 2751 Glen Avenue, Altadena, CA 91001 (the "Property" or the "Residence") was not destroyed in the Eaton Fire, it sustained extensive and insidious damage from dangerous fire-related particulates and toxic compounds that infiltrated the Property, penetrating soft and porous materials and

permeating virtually every surface and enclosed space throughout the Property. Given the close proximity of neighboring structures that burned, emissions from the Eaton Fire were propelled onto and into the Property at high velocity by hurricane-force Santa Ana winds present at the time. The Property lies within an area that was subject to a mandatory evacuation order during the Eaton Fire. The significant smoke damage sustained by the Property as a direct and proximate result of the Eaton Fire has materially impaired the residential function and habitability of the Property.

9. Plaintiffs received an emergency evacuation notice sent to their phones at approximately 3:25 a.m. on January 8, 2025, and promptly evacuated the Property due to the imminent and extreme fire danger.

10. Plaintiffs were able to pack a few small family treasures, along with their two parrots and a dog they were looking after at the time. They fled the Property to stay with Plaintiff Sturm's sister for the rest of that night.

11. Later that same day, Plaintiffs returned to the Property to inspect their losses – they could not bear the uncertainty and needed to confirm what was left of their dream home.

12. Their neighborhood and the surrounding homes were devastated by fire damage. But by some miracle, they returned to a home that was still standing.

13. But a standing home did not mean the Property was unscathed.

14. As far as Plaintiffs could tell from their initial, preliminary inspection of the Property, everything was covered in visible fire residue.

15. At first, Plaintiffs believed the personal property inside their home could simply be cleaned and saved without much hassle. However, upon further self-education and investigation, Plaintiffs learned this was not the case – and that nearly everything they owned but glass or metal items was contaminated, destroyed, or damaged beyond repair. This included sentimental items such as a family antique player piano, a Turkish rug, an antique stove, and Christmas ornaments.

16. Plaintiffs also noticed wind damage to their Property caused by the near-

hurricane-force winds of the Eaton Fire.

17. Plaintiffs filed a timely claim with Travelers on or about January 10, 2025, and were assigned Claim Number I1S1220. But rather than receive quick responses and a speedy resolution to this incredibly traumatic experience, Plaintiffs were forced to endure what they describe as the most stressful experience they have ever endured – a prolonged battle with Travelers, resulting in extreme stress, anxiety, and negative impacts on their health.

18. First, before any inspection at the Property began, Travelers sent Plaintiffs a list of preferred vendors for fire and smoke remediation. This surprised Plaintiffs, given that no inspection of the Property had yet occurred. Plaintiffs did not understand how Travelers could recommend vendors for remediation work if Travelers did not know exactly what work was needed.

19. Eventually, more than a month later, someone from Travelers finally came to inspect the Property and assess the damage. But this was a visual only, non-expert inspection conducted by a Travelers' claims adjuster for the Property at that time– Crystal Keaton ("Ms. Keaton").

20. Notwithstanding the rudimentary and basic nature of Ms. Keaton's inspection, Travelers claimed it was sufficient to determine the full extent of necessary remediation to return the Property to habitable conditions.

21. Pursuant to this initial inspection by Ms. Keaton, Travelers offered Plaintiffs a remediation estimate in February 2025 for approximately $6,633.24. This amount was only meant to cover external remediation work at the Property.

22. Plaintiffs asked several times for a full estimate for remediation work covering the interior, exterior, and their contents. But despite their repeated requests, Travelers did not provide a full estimate until September 8, 2025 – nine months after the Eaton Fire. This estimate was for $77,641.74.

23. This estimate came from a Travelers' claim adjuster – Joe Saxton – to

Plaintiffs on official Travelers' letterhead.[3]

24. In conjunction with their efforts to obtain the full estimate, Plaintiffs also had reasonable concerns with remediation offers by Travelers. Specifically, Plaintiffs did not understand how a non-expert, visual inspection alone could reasonably be sufficient to determine the full scope of contamination, covered damage, and necessary remediation required at the Property, particularly given the known risks associated with toxic smoke, soot, ash, and fire-related contaminants from the Eaton Fire.

25. When Plaintiffs questioned Ms. Keaton about this point, Ms. Keaton told Plaintiffs a more detailed inspection and pre-remediation testing were not required, and that Travelers' suggested remediation would not change based on the results of any pre-remediation testing.

26. Plaintiffs followed up and asked if this remediation would take care of any lead or asbestos in the Property. Ms. Keaton confirmed it would, but yet, none of the remediation vendors Travelers recommended to Plaintiffs listed on their websites that they were certified in lead or asbestos abatement, nor had Travelers otherwise properly certified, tested, or confirmed that the Residence had been evaluated for lead or asbestos by qualified professionals before representing that its proposed remediation would address those hazards.

27. As time passed after the Eaton Fire, Plaintiffs and the L.A. community impacted by the Fires learned through verified medical and scientific sources about the unique dangers posed by wildland-urban interface fires ("WUI fires") and the serious health risks they create for occupants of homes that remain standing. Plaintiffs became acutely aware that validated scientific research established that toxic smoke, ash, and Fire-related contaminants, including hazardous chemicals, heavy metals, and carcinogens, can infiltrate and persist within still-standing homes, contaminating building materials, furnishings, and indoor air, posing significant risks to human health and

[3] **Exhibit A.**

materially impairing a home's residential function, as alleged more fully below.

28. To obtain full peace of mind concerning the unique dangers posed by the fires for occupants of homes that remain standing, Plaintiffs pled with Travelers to authorize a certified industrial hygienist to conduct pre-remediation testing of the Property through expert, scientifically reliable data. This would ensure that all parties, not just Plaintiffs, could better understand the true scope and nature of Fire-related contamination at the Property and thereby undertake appropriate remediation to allow Plaintiffs to return to a safe home.

29. But Ms. Keaton denied Plaintiffs' requests and flat out refused to approve industrial hygienist or contamination testing at the Property prior to remediation. According to Ms. Keaton, though she could point to no language in Plaintiffs' policy (the "Policy") to support her position, the Policy did not cover pre-cleaning testing. She did admit to Plaintiffs, however, that other companies were testing before and after cleaning residential properties impacted by the Eaton Fire.

30. In refusing to identify the specific provisions, and by falsely asserting the Policy did not cover testing, Travelers misrepresented Policy language and the scope of coverage available to Plaintiffs under the Policy and California law. The Policy does provide for such testing – and even if it did not – California law requires Travelers to cover "all loss by fire" including smoke and ash damage. *See* Cal. Ins. Code §§ 2070–2071. Travelers' misrepresentations were in breach of contract and made in bad faith to delay, minimize, and avoid payment of covered benefits owed to Plaintiffs under the Policy.

31. As a result of Travelers' delay and refusal to approve pre-cleaning testing, Plaintiffs had no choice but to pay out-of-pocket to obtain the peace of mind they desperately needed to alleviate their stress and concerns regarding the full scope of damage to the Property.

32. Plaintiffs initially wanted to hire Kaizen Safety Solutions ("Kaizen") to conduct pre-remediation testing at the Property given Kaizen's reputation, but Kaizen

had longer lead times for scheduling. Not wanting to wait any longer and already feeling they were behind schedule because of Travelers' delays and refusal to approve testing, Plaintiffs sought an alternative testing company.

33. Plaintiffs had heard positive things about M.A.R.S. Environmental ("MARS") – a company that specializes in air quality testing and remediation work.

34. Plaintiffs retained MARS, which conducted testing at the Property on or around April 25, 2025, and provided its report (the "MARS Report") on June 4, 2025.

35. After Plaintiffs paid for MARS to inspect the Property, they began hearing from others that insurance companies like Travelers were disregarding testing not performed by a certified industrial hygienist ("CIH"). MARS had many other credentials, but the testing MARS provided at the Property was not performed by a CIH.

36. This caused Plaintiffs significant agony and concern, thinking that if they chose the wrong testing company, they may jeopardize their health, their mental wellbeing, and their home.

37. This fear, and the reports about insurance companies refusing non-CIH reports, caused Plaintiffs to go back and retain Kaizen – who has CIH credentials – to perform an additional inspection of Property.

38. Kaizen conducted its testing at the Property on or around September 15, 2025, and thereafter issued a detailed report (the "Kaizen Report") on or about November 5, 2025, with a revision delivered on January 14, 2026 regarding the need to inspect the crawlspace.

39. Using scientifically valid methodologies and industry-standard practices, the Kaizen Report found that "[f]ull remediation is needed to restore [the Property] to pre-fire conditions," which may include "considerations of a complete tear down" or "removal of contaminated materials down to the studs of the Residence."[4]

40. Lastly, in or about August 2025, Plaintiffs contracted with Environmental

---

[4] **Exhibit B**.

One to do asbestos testing at the Property. Environmental One's report ("Environmental Report") indicated there was asbestos at the Property in settled dust from the fire, and thus similarly concluded the Property is not habitable in its current condition

41. Plaintiffs expected with these reports in hand, and their serious findings, that Travelers would take the full remediation work required at the Property seriously, approve what was necessary, and assist Plaintiffs in getting back to occupancy as soon as possible. That did not happen.

42. Rather than meaningfully address the findings of the Kaizen Report, Travelers abandoned its earlier position that pre-remediation testing was not required and decided it now needed to perform its own testing at the Property, ostensibly because it did not agree with the findings and recommendations of the testing Plaintiffs had organized and obtained from Kaizen and Environmental One.

43. Also, notwithstanding Travelers' decision that testing was now warranted, it refused to reimburse Plaintiffs for the pre-cleaning testing they had sought and paid for out-of-pocket. It was only after months of back-and-forth communication that Travelers paid Plaintiffs the amount of $7,345.00 for the pre-testing cleaning – less than 35 percent of the amount submitted.

44. Travelers' delayed reimbursement compounded the financial and emotional harm suffered by Plaintiffs, which conduct is a knowing and intentional breach of the insurance policy and a breach of the covenant of good faith and fair dealing.

45. For their own inspections, Travelers first retained RegasGroup Inc. ("RegasGroup"). Upon information and belief, Plaintiffs allege RegasGroup did not have CIH credentials at the time it inspected the Property.

46. According to RegasGroup, only a targeted remediation program at the Property was required, consisting of only attic asbestos abatement and whole-home fire residue and heavy-metals cleaning. Unlike Kaizen, RegasGroup found that "full wall

demolition to studs is not warranted."[5]

47. However, RegasGroup itself admitted, and Travelers knew, that RegasGroup was not qualified to opine on to the general habitability of the Property and could only speak to whether or not certain residential standards were met.

48. Following the inspection by RegasGroup, Travelers also hired two additional vendors to perform additional testing and inspections at the Property: J.S. Held LLC ("JS Held") and Hygiene Technologies International, Inc. ("HygieneTech").

49. JS Held inspected the Property on March 27, 2026, and HygieneTech performed additional testing on or about May 19, 2026. Plaintiffs were provided little details as to the nature of these additional inspections and testing by JS Held and HygieneTech.

50. On multiple occasions, Plaintiffs asked Travelers to clarify why it had determined additional testing was necessary, why Travelers was ignoring Plaintiffs' reports and doing its own testing, and how Travelers intended to review and incorporate Plaintiffs' reports with their own findings.

51. Despite these many requests, Travelers simply ignored Plaintiffs and never provided a response.

52. After months of questioning, Plaintiffs finally received the HygieneTech report on August 5, 2026 – even though it was dated July 23, 2026.

53. All the while, Plaintiffs were stuck and unable to move forward with remediation and rebuilding work on their Property because they were waiting for a determination from Travelers regarding their contents' claim. Every additional week of delay pushed back their ability to restore their home and their lives.

54. In short, Travelers ignored the reports Plaintiffs provided to date, and instead, has relied solely on its performed vendor's, RegasGroup, incomplete and

[5] **Exhibit C**.

unreliable report to minimize and deny coverage.[6] Rather than support Plaintiffs when it mattered most, Travelers worked in concert with a biased environmental consulting firm to create the appearance of a second inspection and generate an unreliable and misleading report designed to minimize the extent of the Property's damage. This conduct was undertaken to Travelers' financial advantage and to Plaintiffs' detriment. Through delay, manufactured disputes, and reliance on pretextual vendor opinions, Travelers placed its own financial interests above those of its insureds and sought to evade its contractual and statutory obligations to Plaintiffs. Travelers is playing games and intentionally running out the clock.

55. Despite overwhelming and conclusive evidence to the contrary, Travelers continues to falsely and fraudulently insist that only attic asbestos abatement and whole-home fire residue and heavy-metals cleaning is required – meaning that more than 19 months following the fire the parties still do not have an agreed-upon scope of work to remedy the Property.

56. Travelers' cruel, manipulative, and intentionally harmful tactics have cost, and will continue to cost, Plaintiffs nearly everything: their mental and physical health, their home, their time, their ability to perform at work and advance in their careers, and their financial security. Absent court intervention, Travelers will continue to evade its obligations under the Policy and California Insurance Code §§ 2070-2071 to provide coverage that restores the Property to its pre-loss condition, including full remediation of the Property's heavy smoke and ash contamination.

57. As a direct and proximate result of Defendants' actions, Plaintiffs have incurred more than $75,288.00 out of their approximately $87,400 Loss of Use/Additional Living Expense coverage limit in additional living expenses, unnecessarily depleting those benefits.

---

[6] As of the date of this Complaint, Plaintiffs are unaware to what extent Defendants will rely on the HygieneTech report.

58. At this rate, Plaintiffs are likely to run out of their additional living expenses coverage ("ALE") in or around October 2026 and will be paying both a mortgage and rent out of pocket. And given all of the delays and what little progress has occurred to this point, even if remediation started the date of this Complaint, it would be impossible for Plaintiffs to return to the Property before the ALE runs out.

59. Plaintiffs opened their smoke damage claim as a direct and proximate result of the Eaton Fire in a timely manner. Travelers should have taken steps towards a prompt, fair, and equitable settlement of Plaintiffs' claim. Yet, for far too long, Travelers and its chosen third-party vendors have at all times failed to issue Plaintiffs timely, accurate information and the coverage they are owed for their losses pursuant to the Policy.

60. Accordingly, Plaintiffs bring this action against Defendants, and each of them, seeking damages and all other available remedies arising from the harm caused by Defendants' misconduct as set forth herein.

## JURISDICTION

61. This Court has jurisdiction over Plaintiffs' claims and causes of action asserted herein under 28 U.S.C. § 1332 because there is diversity of citizenship and an amount in controversy greater than $75,000.

62. This Court has personal jurisdiction over all Defendants because all Defendants conduct business and operate in Los Angeles County, within California.

## VENUE

63. Venue in this Court is proper pursuant to 28 U.S.C § 1391 because the events giving rise to this Complaint happened in this District and because the property at issue in this Complaint is located in this District.

64. Defendants Travelers and DOE Defendants do business in this District, within the State of California; Plaintiffs' Policy with Travelers, a contract, was formed in this District, within the State of California, and covers Plaintiffs' Property, which is located in the this District, within the State of California; and Travelers' and DOE Defendants' negligent and tortious acts and omissions, and other wrongful acts, which

Plaintiffs complains of herein, occurred within, and/or revolve around Plaintiffs' Property and/or Policy situated within this District, within the State of California.

## PARTIES

### A. Plaintiffs

65. At all relevant times, Plaintiffs have been citizens of the State of California and residents of Los Angeles County. Plaintiffs reside at the single-family home – the Property – located at 2751 Glen Avenue, Altadena CA 91001.

66. The Property is the primary residence of Plaintiffs and is approximately 1,072 square feet and consists of 2 bedrooms and 1 bathroom. The Property also consists of an attic and a detached garage with an unfinished storage room.

67. The Trust was established by Plaintiffs on or about March 11, 2021. Plaintiffs are the co-trustees of the Trust. The Trust owns the Property.

68. At all relevant times, Plaintiffs held a Homeowners Policy with Travelers, Policy Number 611650019-633-1 - the Policy.[7] The Policy was in full force and effect during the Eaton Fire.

69. The Policy remains in full force and effect today.[8] Plaintiffs wish to continue to maintain their Policy. The theoretical availability of other insurance does not cure Plaintiffs' continued exposure to Travelers' challenged practices. Homeowners insurance in California is increasingly difficult to obtain and not readily replaceable. Nor is the California FAIR Plan an adequate substitute, because it provides more limited protection and requires supplemental policies.[9]

---

[7] *See* **Exhibit D**

[8] *See* **Exhibit E**

[9] NPR, KPBS, Copley, Michael *et al.*, *It's harder to get home insurance. That's changing communities across the U.S.* (Nov. 12, 2025), available at: https://www.npr.org/2025/11/12/nx-s1-5546754/climate-home-insurance-cop30-prices-expensive-disasters (last viewed August 25, 2026) (Californians struggle to obtain and retain homeowners insurance "as major insurance companies have pulled out of the state in recent years.").

70. The Policy provided for, *inter alia*: Coverage A, Dwelling - $437,000; Coverage B, Other Structures - $65,900; Coverage C, Personal Property - $218,500; and Coverage D, Loss of Use - $87,400.

**B. Defendants**

71. At all times relevant to this pleading, Defendants, and/or each of them identified and named herein, were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other Defendants; and were operating within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture; and each of Defendants has ratified and approved the acts of each of the remaining Defendants. Each of Defendants aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations and duties to Plaintiffs, as alleged herein. In taking action to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings alleged herein, each of Defendants acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

72. The respective officers, directors and/or managing agents and/or employees of Defendants, and each of them, had knowledge of, participated in, authorized and/or ratified the wrongful conduct as alleged herein.

**1. Travelers Defendants**

73. Plaintiffs are informed and believe and thereon allege that Travelers Company and Standard Fire were at all relevant times a subsidiary of The Travelers Companies, Inc. and that they specifically focused on property and casualty insurance, including homeowners, renters, and commercial fire coverage, to consumers in various states, including California.

74. Defendant Travelers Company is a Connecticut corporation with its principal business address located at One Tower Square, Hartford, Connecticut, 06183.

75. Defendant Standard Fire is a Connecticut corporation with its principal

business address located in Hartford, Connecticut. Defendant Standard Fire is identified in the Policy as a subsidiary or affiliate of Travelers Company.

76. Both Travelers Company and Standard Fire are duly licensed to conduct business in California and actively operates within the State of California, including in this District.

77. The Policy identifies Standard Fire as "a subsidiary or affiliate of [Travelers Company]." The Policy instructs that "Your Agency's Name and Address" is "C/O Travelers[.]"[10]

78. Travelers held itself out as the insurer, along with Standard Fire, and directly managed the Claim.

79. The Policy provides "Travelers Protect Plus Plus® coverage, which is a proprietary, trademark Travelers Company product (see image below).[11]

TRAVELERS PROTECT PLUS

**Serial number**
87149529

**Filing date**
2016-08-24

**Registration number**
5498503

**Registration date**
2018-06-19

**Status**
LIVE REGISTERED

**Status date**
2024-01-07

**Registration type**
PRINCIPAL

**Case status**
A Sections 8 and 15 combined declaration has been accepted and acknowledged.

**Publication date**
2017-07-25

**Class**
036

**TM5 Status**

LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Related Properties Information**

**Claimed Ownership of US Registrations** 1611053 , 3494647 , 3494648

**Goods and services**

IC 036: Property casualty insurance underwriting services. | **First Use Anywhere:** *November 20, 2017* | **First Use in Commerce:** *December 03, 2017*

**Current owner**

**Name**
The Travelers Indemnity Company

**Address**
One Tower Square
Hartford CONNECTICUT 06183
UNITED STATES OF AMERICA

**Entity type**
CORPORATION

**Organized**
CONNECTICUT

**Ownership transitions**
No assignments

---

[10] **Exhibit D**

[11] United States Patent and Trademark Office, Trademark Search, Result for "Travelers Protect Plus", available at https://tmsearch.uspto.gov/search/search-results/87149529 (last viewed August 25, 2026).

80. The Policy identifies Travelers Company by name on every single page of the Policy, which itself is entitled "Travelers Insurance Policy."[12]

81. Plaintiffs requested a certified reproduction of the Policy. The certification was signed by Peter J. Michalik, Director, Operations Document Manager for Travelers Company.[13]




82. Standard Fire's Statement of Information, Corporation, filed with the State of California, Office of the Secretary of State on September 9, 2025 identifies Standard Fire's Principal Address and Mailing Address as One Tower Square, Hartford, CT 06183, and identifies Wendy C. Skjerven as Secretary, Daniel S. Frey as Chief Financial Officer, and Nicholas Seminara as Chief Executive Officer.[14]

83. Travelers Company's Statement of Information, Corporation, filed with the State of California, Office of the Secretary of State on May 6, 2026 identifies Travelers

[12] **Exhibit D** at p. 9, 11

[13] LinkedIn, Peter Michalik, available at https://www.linkedin.com/in/petermichalik (last viewed August 25, 2026).

[14] **Exhibit F** (Standard Fire's September 9, 2025 Statement of Information)

Company's Principal Address and Mailing Address as One Tower Square, Hartford, CT 06183, and identifies James Liston as Chief Executive Officer, Wendy C. Skjerven as Secretary, and Daniel S. Frey as Chief Financial Officer.[15]

84. In addition to common offices and common officers/directors, Standard Fire and Travelers Company share the same Agent for Service of Process, CSC – Lawyers Incorporating Service Registered Corporate 1505 Agent.

85. These entities, individually and collectively, through an integrated corporate structure (the granular details of which are presently unknown to Plaintiffs but are expected to be revealed through discovery), operate as a unified business enterprise engaged in the advertising, marketing, sale, underwriting, servicing, and administration of casualty and property insurance, including homeowners insurance, throughout the United States and its territories.

86. Plaintiffs are informed and believe, and thereon allege, that Travelers Company and Standard Fire acted jointly, through an integrated claims operation, to market, issue, administer, underwrite, interpret, and adjust the Policy and claim at issue. At all relevant times, Plaintiffs were in contractual privity with Defendant Travelers Company and Defendant Standard Fire.

87. Together, Travelers Company and Standard Fire advertised, issued, administered, and managed Plaintiffs' Policy; developed, underwrote, and implemented Policy-related decisions; and made and communicated claim-related decisions to Plaintiffs.

88. Plaintiffs' injuries are fairly traceable to Travelers Company and Standard Fire's integrated claim handling and underwriting, including but not limited to delayed and withheld benefits, failure to fully and fairly investigate the claim, and continued refusal to fund remediation, and those injuries are redressable through monetary, declaratory, restitution, and injunctive relief against both Travelers entities.

[15] **Exhibit G** (Travelers Company's May 6, 2026 Statement of Information)

89. Travelers Company and Standard Fire are jointly and severally liable for the causes of action asserted herein. All allegations in this Complaint are asserted equally against both Defendants. The conduct of Travelers Company and Standard Fire caused Plaintiffs to suffer the harms alleged herein. Travelers Company and Standard Fire cannot be regarded as having separate existences. To do so would promote and unjust and inequitable result. Permitting either Travelers Company or Standard Fire to avoid liability based on purported corporate distinctions would inequitably deprive Plaintiffs of recourse under a Policy that Travelers Company and Standard Fire collectively marketed, issued, underwrote, administered, and managed.

90. A reasonable jury could conclude that Travelers Company and Standard Fire operated as one and the same enterprise and that, in the interests of justice and equity, they should be treated as such.

91. The failure to include any of these entities would sanction a fraud and promote injustice. The refusal to invoke liability on the part of any of these entities would bring about an inequitable result.

92. Travelers seeks sympathy, claiming that it experienced catastrophic losses relating to the 2025 California wildfires – estimating around $1.7 billion pre-tax losses.[16]


ABOUT CAREERS AGENTS INVESTORS CONTACT US

TRAVELERS | Investor Relations

FINANCIAL INFORMATION | EVENTS & PRESENTATIONS | FINANCIAL STRENGTH RATINGS | INVESTOR TOOLKIT | CORPORATE GOVERNANCE | SUSTAINABILITY | POLITICAL CONTRIBUTIONS AND LOBBYING | NEWSROOM

Press Release Details

VIEW ALL NEWS →

Travelers Announces Preliminary Catastrophe Loss Estimate for January 2025 California Wildfires

February 11, 2025

NEW YORK--(BUSINESS WIRE)-- The Travelers Companies, Inc. (NYSE: TRV ) today announced a preliminary estimate of catastrophe losses related to the January 2025 California wildfires.

The Company's preliminary estimate of catastrophe losses relating to the January 2025 California wildfires is $1.7 billion pre-tax ($1.3 billion after-tax). The preliminary estimate includes losses from the Company's personal and commercial segments, including the Company's Fidelis quota share, as well as estimated assessments from the California FAIR Plan and recoveries from reinsurance.

---

[16] https://investor.travelers.com/newsroom/press-releases/news-details/2025/Travelers-Announces-Preliminary-Catastrophe-Loss-Estimate-for-January-2025-California-Wildfires/default.aspx

93. Insurance companies, like Travelers, like to paint a gloomy picture about their purported devastating losses, which they disingenuously claim threaten to put them out of business. Insurance companies use complex bookkeeping schemes to prop up this misleading narrative. In reality, property insurers in the United States cleared nearly $25.4 billion in underwriting profit in 2024, and their net investment income surged to $164.3 billion.[17] Property casualty insurers ended 2024 with a record-breaking $167 billion in profit and 151 billion in profit in 2025.[18]

94. Despite Travelers' claims of financial distress, its publicly reported financial results reveal a markedly different reality. In January 2026, Travelers reported fourth quarter net income of $2.496 billion, up 20 percent, and core income of $2.511 billion, up 18 percent.[19] At the same time, Travelers reported that for "the full year, core income was up 26% to $6.3 billion."[20]

95. Moreover, even as Travelers raked in massive profits, it sought to exploit California policyholders by demanding a 6.9% increase in homeowners' insurance rates.[21] This brazen push for higher premiums, occurring alongside claim mishandling and underpayment and denial of covered losses, underscores Travelers' profit first strategy and its disregard for its obligations to insureds, like Plaintiffs.

96. In stark contrast to the insurance industry's public campaign of pessimism, business is booming and executives are thriving, while policyholders like Plaintiffs are subjected to delayed, underpaid, and improperly denied claims and left suffering in the

[17] https://therevolvingdoorproject.org/mapping-the-home-insurance-crisis-underwriting-profits/; https://content.naic.org/sites/default/files/2024-annual-property-casualty-and-title-insurance-industries-analysis-report.pdf

[18] https://www.justice.org/resources/research/insurance-industry-continues-to-make-record-profits

[19] https://investor.travelers.com/newsroom/press-releases/news-details/2026/Travelers-Reports-Excellent-Fourth-Quarter-and-Full-Year-Results/default.aspx

[20] *Id.*

[21] https://www.sfchronicle.com/california/article/aaa-travelers-home-insurance-22236797.php?

wake of insurers' unlawful and bad faith claim handling practices.[22]

**2. Defendant DOES 1 through 10**

97. The true name and capacities of the Defendants sued herein as DOES 1 through 10, and each of them, whether corporate, individual, municipal or otherwise, are unknown to Plaintiffs at this time, who therefore sue said Doe Defendants by such fictitious names pursuant to Code of Civil Procedure section 474. Plaintiffs are informed and believe, and thereon allege, that each Defendant designated herein as a Doe Defendant caused injuries and damages proximately thereby to Plaintiffs as hereafter alleged, and that each Doe Defendant is liable to Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by Plaintiffs. If/when Plaintiffs learn these Defendants' true names and capacities, Plaintiffs will seek leave to amend this pleading accordingly. All allegations in this Complaint are asserted equally against DOES 1 through 10.

## BACKGROUND

**A. The Eaton Fire Caused Widespread Devastation and Generated Toxins that Infiltrated the Homes Left Standing, Like Plaintiffs' Property**

98. The Eaton Fire ignited in the hills of Eaton Canyon, near Altadena, on the evening of January 7, 2025. The Eaton Fire destroyed more than 9,400 structures and tragically killed 19 people, making it the deadliest fire in modern L.A. County history.[23] During the Fires, indoor levels of volatile organic compounds ("VOCs"), such as benzene, toluene, ethylbenzene, and xylenes—all chemicals known to be released when household materials burn—were "often similar to those measured outdoors" during the

[22] https://therevolvingdoorproject.org/mapping-the-home-insurance-crisis-underwriting-profits/

[23] https://apnews.com/article/california-eaton-fire-smoke-contamination-insurance-41e3b685ea67ef72a5dc1dadc16103b4; https://www.cbsnews.com/losangeles/news/eaton-fire-death-toll-rises/

Fire.[24] Now that the flames have been extinguished, insidious dangers remain. The smoke and ash, toxic residues (including cyanide and asbestos), and heavy metals (including manganese, lithium, beryllium, lead, arsenic, cobalt) that were spread into the atmosphere by the Eaton Fire have infiltrated the homes left standing.

99. WUI (wildland-urban interface) fires, like the Eaton and Palisades Fires, pose a unique danger to the community and to the structures that survive because of the types of pollutants that are created by these types of fires. Buildings, automobiles (including electric vehicles powered by lithium-ion batteries, which are ubiquitous in Los Angeles County)—and even everyday items like shower rods, upholstered chairs, and LED lights—, "become poisons when they are set on fire."[25] These poisons are released into the atmosphere and contaminate communities and structures beyond the fire's perimeter. Ash from WUI fires is "not just ash. … A lot of [the ash is] petroleum product and different composites that are extreme hazards" when they combust.[26] Smoke from modern WUI fires contains potent neurotoxins and carcinogens. The long-term consequences of exposure to these smoke and toxins cannot be overstated. To illustrate, lead is a "potent neurotoxin with no safe level of exposure in children[,]" and similarly there is "no safe level of beryllium exposure[,]" as it is known to cause cancer in humans.[27]

100. Laboratory testing reveals that these toxins, which are a direct and proximate result of the Eaton Fire, can be found throughout homes in the vicinity of the Eaton Fire.

---

[24] Pasadena NOW, *Altadena Homes Face Lingering Indoor Smoke Hazards After Wildfires, Newly-Published UCL Study Finds*, Based on a Story by City News Service (Jan. 2, 2026).

[25] https://www.nytimes.com/interactive/2025/06/24/realestate/los-angeles-fires-toxic-homes.html?searchResultPosition=4

[26] https://apnews.com/article/california-wildfires-toxic-ash-health-fa845b7573ba463bf2e61ea3042c66a2

[27] *See* Callimachi, Rukmini and Migliozzi, Blacki, The New York Times, *How Did This Family End Up Back in a Toxic House?* (Dec. 29, 2025), a true and correct copy of which is attached hereto as **Exhibit H**.

Indeed, toxic smoke and ash penetrates the fibers of a house.[28] Toxins are detected at dangerously high levels and deposited in places like drywall, upholstered furniture, carpeting, clothing, and HVAC systems, to name only a few examples.

101. Exposure to these toxic chemicals "has been shown to have severe health consequences" in humans.[29] "We know people exposed to a lot of [WUI fire] smoke have higher risks for cardiovascular problems and cancer," said Sharon Chinthrajah, MD, a researcher and professor of medicine at Stanford. "[WUI fire] smoke is especially toxic," Dr. Chinthrajah explained, "because it contains bits of whatever is burning." WUI fire smoke and ash includes "vegetation, organic materials that generate lots of polycyclic aromatic hydrocarbons ("PAHs") as they burn," some of which are known carcinogens. WUI fire smoke and ash also includes "biological particles such as pollen and mold spores." In WUI fires, smoke and ash includes many other things that also burn: "buildings and vehicles; concrete; metals, including toxic heavy metals such as mercury and cadmium; rubber; wires; large amounts of plastic. These materials get aerosolized and travel with the wind, sometimes very long distances."[30]

102. American soldiers on military bases in Iraq and Afghanistan who were exposed to the toxic fumes that emanate from burn pits—open areas where a wide range of objects commonly burned during WUI fires, such as household trash, batteries, paint, computers, and discarded tires, are set ablaze—have developed bladder, lung, testicular, and brain cancers, as well as a myriad of other serious health conditions. The Eaton Fire was "like a burn pit" because it radiated hazardous smoke, ash, and potentially deadly

---

[28] https://www.nytimes.com/2026/01/27/realestate/california-wildfires-damage-insurance.html

[29] https://www.nytimes.com/interactive/2025/06/24/realestate/los-angeles-fires-toxic-homes.html?searchResultPosition=4

[30] https://med.stanford.edu/news/insights/2025/09/wildfire-smoke-health-risks-science.html

toxins that settled inside homes both inside and near the burn zones.[31]

103. Mohammed Baalousha, a professor at the University of South Carolina who studies ash samples to better understand what materials are present and how they change in the wake of WUI fires, likens WUI fires to the September 11, 2001 attacks. Individuals exposed to ash from the September 11, 2001 attacks—even those exposed to the dust for only a short period of time—have suffered "increased cases of all kinds of different illness, sickness." Professor Baalousha says "'[it] could take a long time to tease out all of the potential effects of these particles' because of how many complex chemical reactions are going on and how many substances still remain to be studied." Baalousha advises anyone going near or handling the smoke ash and debris to wear personal protective gear because the ash is so deleterious to human health.[32]

104. In a study published nearly one year after the Eaton and Palisades Fires, researchers with the UCLA Fielding School of Public Health report finding that "in some homes within burn zones, levels of certain [VOCs] were higher during the post-fire recovery period than while the fires were actively burning." Dr. Yuan Yao, the study's lead author, explained that it is likely that "off-gassing from smoke-impacted materials" leads to this "prolonged indoor VOC exposure—even after outdoor fire activity subsides."[33]

105. Concerned residents of the communities impacted by the Eaton Fire formed a grassroots coalition, called Eaton Fire Residents United ("EFRU"), in the wake of the devastating Eaton Fire. Among other things, EFRU provides a platform for homeowners whose properties withstood the fire to share their data from professional industrial

---

[31] https://www.nytimes.com/interactive/2025/06/24/realestate/los-angeles-fires-toxic-homes.html?searchResultPosition=4

[32] https://apnews.com/article/california-wildfires-toxic-ash-health-fa845b7573ba463bf2e61ea3042c66a2

[33] Pasadena NOW, *Altadena Homes Face Lingering Indoor Smoke Hazards After Wildfires, Newly-Published UCL Study Finds*, Based on a Story by City News Service (Jan. 2, 2026)

hygienist testing performed on their homes. As of March 31, 2026, EFRU reported that, out of 234 tested for lead during pre-remediation testing, 100% (i.e., all 234) of those homes tested positive for lead. Professional remediation was recommended in all cases.[34] The number of lead-infested homes reported to EFRU by community members continues to rise as more residents share their test results.

106. Far too many homeowners remain displaced because of the toxic smoke, soot, and/or ash that has seeped into their homes from the Eaton Fire. Homeowners and their families are forced to live in temporary housing as they battle against their insurers to receive the remediation and repair necessary to restore their properties and possessions to pre-Eaton Fire conditions.

**B. Smoke, Soot, and Ash Contamination is Covered Under California Insurance Code §§ 2070-2071; Insurers are Obligated to Provide Adequate Remediation that is Validated Before Occupancy**

107. In 1909, after the 1906 San Francisco earthquake and fires, California mandated a Standard Fire Policy that is codified today at California Insurance Code §§ 2070-2071.

108. Under these provisions, all homeowners insurance providers in California are required to cover "all loss by fire."

109. "All loss" includes contamination that renders the insured property uninhabitable, including toxic contamination from fire debris and ash from WUI fires.

110. Any written policy, or any insurer's action, that would seek or does seek to narrow coverage below this standard is invalid.

111. Homeowners, like Plaintiffs, are lawfully entitled to receive comprehensive property remediation and repair under their insurance policies. "Evidence showing that the remediation approved by insurers is inadequate is mounting."[35]

---

[34] https://www.efru.la/

[35] *See* **Exhibit H**

112. Clearance before occupancy is critical. EFRU reports that 6 out of every 10 so-called remediated homes remain uninhabitable due to lead and/or asbestos levels.[36] The average remaining lead levels were almost 60 times higher than the Environmental Protection Agency's standard.[37] "Experts believe the lead, which can linger in dust on floors and windowsills, comes from burned lead paint. The University of Southern California reported that more than 70% of homes within the Eaton Fire were built before 1979, when lead paint was common."[38]

113. Insurance companies, like Travelers, are endorsing surface-level cleanups and wipe downs based only on what can be seen and smelled, and testing (if at all) only for a small subset of contaminants. Insurance companies are cutting corners and pinching pennies, prioritizing their own financial interests over policyholder rights and personal safety, and disregarding the statutory mandate to provide coverage for "all loss by fire."[39]

114. A New York Times investigation illustrated how families are being driven by their insurers to return to contaminated homes, sharing the story of a family whose strands of hair were taken after returning home and analyzed by a professor at the Icahn school of Medicine at Mount Sinai in New York. "The tests revealed that the couple and their two children had been exposed to a surge of heavy metals as soon as they returned home."[40] State and federal lawmakers have begun calling for investigation into insurers manipulative practices and proposing legislation that would prohibit insurers from misleading policyholders and using questionable science to pressure families to return to

---

[36] https://www.efru.la/

[37] Pineda, Dorany and Hong, Jae C., Associated Press, *Homes that survived Historic L.A. Wildfires Now Face Dangerous Levels of Toxic Compounds* (Jan. 5, 2026), https://www.pbs.org/newshour/nation/homes-that-survived-historic-la-wildfires-now-face-dangerous-levels-of-toxic-compounds

[38] *Id.*

[39] *See* California Insurance Code §§ 2070-2071; **Exhibit H**

[40] https://www.nytimes.com/2026/01/27/realestate/california-wildfires-damage-insurance.html

homes that have not been certified safe for re-occupancy.[41]

115. Policyholders, like Plaintiffs, are reclaiming their rights under their policies and fighting back for their safety, as well as the safety of their loved ones and communities. Each surviving home that has suffered Fire-related damage should be competently remediated and should "be required to achieve comprehensive clearance status before residents are forced to move back in."[42] Thorough, validated property remediation is the only way to make these homes truly safe and habitable once again.[43]

### C. Insurers are Required to Fully Investigate and Fairly Handle Smoke and Ash Claims

116. On or around March 7, 2025, the California Department of Insurance ("CDI") issued Bulletin 2025-7, wherein it declared its expectations about how insurance companies process and pay smoke and damage claims as a result of WUI fires, including the Eaton Fire and the Palisades Fire. [44]

117. CDI directed insurers smoke damage claims to comply with California Insurance Code provisions that govern claims settlement practices, including but not limited to: California Insurance Code § 790.03(h), which prohibits unfair claims settlement practices; and § 2695.7(d) of the Fair Claims Settlement Practices Regulations (California Code of Regulations, Title 10), which requires every insurer to conduct and diligently pursue a thorough, fair, and objective investigation of a claim. CDI instructed insurers to adopt and apply reasonable standards for processing smoke damage claims, and to make good faith efforts to effectuate prompt, fair, and equitable settlements of

---

[41] *Id.*
[42] https://www.efru.la/
[43] https://www.nytimes.com/interactive/2025/06/24/realestate/los-angeles-fires-toxic-homes.html?searchResultPosition=4; https://apnews.com/article/california-eaton-fire-smoke-contamination-insurance-41e3b685ea67ef72a5dc1dadc16103b4
[44] https://www.insurance.ca.gov/0250-insurers/0300-insurers/0200-bulletins/bulletin-notices-commiss-opinion/upload/Bulletin-2025-7-Insurance-Coverage-for-Smoke-Damage-and-Guidance-for-Proper-Handling-of-Smoke-Damage-Claims-for-Properties-Located-in-or-near-California-Wildfire-Areas.pdf

smoke damage claims where liability is reasonably clear.

118. CDI explained the findings of public health officials, which are that human exposure to fire debris and ash from WUI fires pose significant health risks to public health because these Fire byproducts often contain asbestos, heavy metals, chemicals, and other hazardous substances. As a result, insurers must act reasonably and promptly to investigate and process a policyholder's claim for smoke and ash damage on their property. Insurers must fund and conduct an appropriate investigation before denying a smoke damage claim, including contracting and paying for professional testing.

119. CDI made clear that the expectations promulgated in Bulletin 2025-7 apply "to all insurance companies[.]"

120. Nevertheless, many insurers have ignored Bulletin 2025-7's unequivocal directives. CDI has been, and continues to be, inundated with consumer complaints regarding a wide range of wrongful claims handling by insurers.

121. In collecting hundreds of consumer complaints from WUI fire survivors, CDI has observed some troubling patterns in wrongful claims handling of smoke and damage claims, including "the frequent reassignment of multiple adjusters with little continuity in communication, inconsistent management of similar claims, and inadequate record-keeping or information-sharing among claims teams."[45]

122. Plaintiffs have experienced each of these hardships, and more, as a direct and proximate result of Travelers' actions. Plaintiffs, like countless other WUI fire survivors, have suffered unnecessary stress, unreasonable delay, and a prolonged path to recovery, resulting in a general erosion of trust in their insurer and further harm beyond the covered loss itself.

## FACTUAL ALLEGATIONS

123. Plaintiffs are residents of Altadena, California, and at all relevant times were

[45] https://www.insurance.ca.gov/0400-news/0100-press-releases/2025/release043-2025.cfm

the occupants of the insured Property located at 2751 Glen Avenue, Altadena, CA 91001.

124. On or around all times relevant hereto, Plaintiffs maintained an active residential property insurance policy with Standard Fire, Policy No. 611650019-633-1, covering the Property, including coverage for dwelling (Coverage A), additional living expenses, personal property, and other related coverages as set forth in the Policy.

125. The Policy states that Standard Fire is a subsidiary or affiliate of Travelers Company.

126. On or around January 7, 2025, the Property sustained damage from smoke and ash contamination resulting from the Eaton Fire.

127. On or around January 10, 2025, Plaintiffs promptly provided notice of the loss to Travelers and opened Claim No. I1S1220.

**A. Travelers Misrepresented Policy Language and Terms of Policy Coverage to Plaintiffs, and Failed to Provide Coverage for Testing as Required by the Policy and California Law**

128. Shortly after filing their claim, Plaintiffs were assigned their first claim adjuster: Ms. Keaton.

129. On or about February 5, 2025, Ms. Keaton performed an initial inspection of the Property. That inspection was visual only. Ms. Keaton did not collect samples from the Property, conduct air, surface, or materials testing, or otherwise test for fire-related contaminants.

130. Based solely on her non-expert, visual inspection, Ms. Keaton noted heavy soot and ash to the interior and exterior of the Property. Additional wind damage was noted to the fence and garage door.

131. Following her inspection, on or about February 15, 2025, Ms. Keaton prepared an initial estimate for the exterior repairs – approximately $6,633.24 for Coverage A. But due to the proximity to total losses in the area, Ms. Keaton informed Plaintiffs that cleaning would not start until Phase 2 cleanup was completed by the

Federal Emergency Management Agency.[46]

132. Following Ms. Keaton's preliminary, non-expert inspection, Plaintiff Sturm sent her an email summarizing what occurred during the walk-through and seeking further clarification pertaining to some of Ms. Keaton's comments regarding pre-cleaning testing. For example, during the inspection, Ms. Keaton told Plaintiffs that testing was covered under the Policy and that Travelers' smoke remediation vendors would handle that testing as part of their standard process, unless the chosen remediation company did not do testing. In such a case, Plaintiffs could choose a company to come and do the testing.

133. More than a week later, Ms. Keaton emailed Plaintiffs stating that while some companies are testing before they clean a property and after, it was not warranted at the Property. Ms. Keaton explained this was because it was already known that soot and ash are very toxic, and personal protective equipment will be needed for smoke remediation.

134. According to Ms. Keaton, only testing that occurs after the final cleanup of the Property is approved under the Policy.

135. When Plaintiff Sturm asked follow-up questions as to whether the remediation process would change if soot or ash happened to contain lead, asbestos, or arsenic, Keaton responded that the remediation process would be the same.

136. As time passed after the Eaton Fire, Plaintiffs learned through verified medical and scientific sources about the unique dangers posed by WUI fires and the serious health risks they create for occupants of homes that remain standing. Plaintiffs became acutely aware that validated scientific research has established that toxic smoke, ash, and Fire-related contaminants, including hazardous chemicals, heavy metals, and carcinogens, can infiltrate and persist within still-standing homes, contaminating building

---

[46] "Phase 2" refers to the government-administered removal of fire-damaged structures, ash, debris, and contaminated soil from properties affected by the Eaton Fire, as part of the process of preparing those properties for reconstruction.

materials, furnishings, and indoor air and posing significant risks to human health.

137. This information concerned Plaintiffs greatly, and so, on March 6, 2025, Plaintiff Rippberger contacted Ms. Keaton looking for Travelers to approve pre-cleaning testing at the Property so Plaintiffs and Travelers could learn with greater detail what unique dangers and health risks were present in the Property that could not be observed with non-expert, visual only inspections like the one Travelers performed.

138. Travelers denied the request several weeks later. Ms. Keaton wrote that pre-testing was not approved because the recommended cleaning companies are specially trained and certified in smoke remediation, and so all cleaning performed would eliminate hazardous and toxic materials that could be present.

139. Again, Ms. Keaton stated that only post-cleaning testing would be approved to ensure the Property is safe to return.

140. This explanation did not sit right with Plaintiffs. For one, they did not see how Ms. Keaton's visual inspection alone was sufficient to determine the full scope of contamination, covered damage, and necessary remediation work. Travelers' proposed approach could not reasonably be considered scientifically valid or in the proper sequential order. Travelers was attempting to prescribe a remediation scope before first obtaining reliable pre-cleaning testing to identify the contaminants present, their concentration, and the locations and materials impacted. Further, given that other companies and carriers were performing pre-cleaning testing on homes in their area, Plaintiffs reasonably expected that they should get the same pre-remediation testing done at their Property.

141. Plaintiffs asked Ms. Keaton to identify the specific Policy language stating that pre-cleaning testing was not covered. And if Travelers could not identify explicit language, asked again that Travelers approve pre-cleaning testing.

142. Rather than point to any specific language denying pre-cleaning testing, Ms. Keaton simply responded that the Policy did not expressly allow for pre-cleaning testing nor post-cleaning testing. It was Travelers' position that Ms. Keaton's visual examination

was sufficient to assess the smoke damage inside the Property.

143. During this period, Travelers knowingly misrepresented the terms of the Policy and the scope of available coverage to Plaintiffs by repeatedly and falsely asserting that testing of the Property for fire-related contaminants was not covered and would not be paid for because the Policy purportedly did not provide for such testing, when, in fact, it does. California law and the Policy require Travelers to pay for independent and scientifically sound testing and to otherwise reasonably investigate smoke damage claims in order to compensate insureds, including Plaintiffs, for required remediation. California law further mandates that insurers conduct thorough, fair, and objective investigations and make good-faith efforts to effectuate prompt, fair, and equitable settlements of claims where, as here, liability is reasonably clear. *See* Cal. Code Regs., tit. 10, § 2695.7(d); Cal. Ins. Code § 790.03(h)(5).

144. The skilled and scientifically sound testing Plaintiffs were requesting was necessary to satisfy Travelers' statutory and contractual duties to conduct a thorough, fair, and objective investigation of Plaintiffs' claim. Instead, Travelers knowingly refused to fulfill these obligations, continued to misrepresent available coverage, and engaged in oppressive and fraudulent conduct designed to delay, obstruct, and undermine Plaintiffs' claim, causing it to remain at a standstill for months and resulting in prolonged delay and a complete halt in claim progress.

145. This back-and-forth exchange, and Travelers' unwillingness to provide pre-cleaning testing, resulted in time delays and hindered Plaintiffs' ability to make informed decisions about remediation work at the Property and re-occupancy. It also delayed their ability to timely hire a certified industrial hygienist to inspect the property.

146. It was not only pre-cleaning testing that Travelers refused to provide. Around this time, Plaintiffs wrote to Ms. Keaton to explain that prior to the Eaton Fire, Plaintiff Sturm would walk to work and Plaintiff Rippberger would use the family's vehicle. But since the fire and having to move to temporary housing located farther from Mr. Sturm's work, Mr. Sturm now uses the car, and Ms. Rippberger relies on rideshare

services like Lyft for daily needs that she could previously handle with the family car.

147. When Plaintiffs sought reimbursement for these rideshare trips, Ms. Keaton would not approve them. Plaintiffs wrote many times over a period of several weeks seeking clarification, but Ms. Keaton refused to respond or explain her reasoning, eventually saying the rideshare reimbursement issue was foreclosed and that she would "not continue to go back and forth over this matter."[47]

148. Ms. Keaton's failure to respond timely and her dismissive attitude caused Plaintiffs to request a new adjuster from Travelers.

149. Following their request, Joe Saxton became the adjuster for Plaintiffs' claim in or around July 2025.

150. Ultimately, Plaintiffs decided a visual inspection was not enough to ensure they had a full picture of the damage to their Property, and given Travelers' delays in responding to Plaintiffs' communication and outreach efforts and flat-out refusal to approve industrial hygienist or contamination testing at the Property, Plaintiffs moved forward out-of-pocket to hire independent companies to perform hygienist and contamination testing at the Property.

151. MARS conducted testing at the Property on or around April 25, 2025 and provided the MARS Report on June 4, 2025. The MARS Report noted, *inter alia,* that there was:

> Soot presence in all areas, especially within the wall cavities indicates extensive fire impact. Combustion by-product residues will settle on household surfaces and contents, including electronics, HVAC systems, and soft goods. The presence will lead to corrosion, degradation of materials, and health risks. Typically, cleaning is not feasible due to the acidic and toxic nature of fire related contaminants, necessitating replacement of affected items.[48]

---

[47] **Exhibit I**. Correspondences between Plaintiffs and Travelers' claim adjusters like Ms. Keaton involve the Travelers' logo.

[48] **Exhibit J**.

152. The MARS Report ultimately concluded that "[c]omplete remediation is required to return the home to its pre-fire condition."[49]

153. Thereafter, Kaizen – with CIH staff – conducted additional testing at the Property on or around September 15, 2025, and issued the Kaizen Report on or about November 5, 2025 with a revision delivered on January 14, 2026.

154. In no uncertain terms, the Kaizen Report demonstrates that:

> The fire damage to this residence detailed herein is serious and extensive based on the presence of cyanide, lithium, lead, chromium and numerous other carcinogens and contaminants caused by the Eaton Fire. The fire damage is pervasive and impacts every 'nook and cranny' of this residence. **It is at an infiltration level of contamination.**"[50]

155. Lastly, Plaintiffs contracted with Environmental One to do asbestos testing at the Property. The Environmental Report concluded that the Property is not habitable in its current state.[51]

156. Plaintiffs provided Travelers with the Environmental One Report on or about November 3, 2025 and the Kaizen Report on or about November 10, 2025.

157. Given what Plaintiffs had heard about insurance companies refusing non-CIH reports, Plaintiffs did not provide Travelers with the MARS Report.

158. But rather than meaningfully addressing the findings of the Kaizen Report and Environmental Report, Travelers instead sought to avoid its coverage obligations by retaining RegasGroup to conduct more limited testing meant to minimize and deny coverage.

159. RegasGroup performed its testing at the Property on January 2, 2026 – almost a year after the fire.

160. RegasGroup's testing was materially inferior in quality, scope, and scientific reliability and fell far below the standards and rigor of the Kaizen Report. RegasGroup

[49] *Id.*
[50] **Exhibit B** at p. 4
[51] **Exhibit K.**

failed to perform, amongst other things: (1) Chloride and sulfate anion testing in settled particulates throughout the residence; (2) Bulk sampling and laboratory analysis of building materials and contents for total cyanide (CN); (3) Real-time airborne particulate monitoring across seven particle size ranges (0.1–10 microns), including indoor vs. outdoor comparisons; (4) Real-time airborne chemical (gas-phase) analysis using FTIR instrumentation (GASMET), measuring compounds such as formaldehyde, acrolein, acetaldehyde, hydrogen cyanide, methyl chloride, and others; (5) Airborne exposure modeling based on settled dust date; (6) Sampling on wall plaster, attic spaces, and inside the HVAC system (including supply ducts, return ducts, and the HVAC unit itself; (7) Whole-structure particulate testing (soot, char, ash) across both accessible and hidden areas of the home; and (8) An integrated multi-pathway assessment combining surface sampling, bulk material sampling, real-time air monitoring, and laboratory chemical analysis.

161. RegasGroup focused on surface cleaning followed by testing. Kaizen, who is more qualified and did more extensive testing, focuses on the elimination of contamination by removing the source because contamination is embedded, persistent, and present within inaccessible places.

162. According to RegasGroup "full wall demolition to studs is not warranted". Instead, only a targeted remediation program at the Property was required, consisting of attic asbestos abatement only and whole-home fire residue and heavy-metals cleaning.

163. Conflicted at the dueling reports, and not being experts themselves, Plaintiffs returned to Kaizen to seek clarification.

164. In response, Kaizen noted in a subsequent report that:

> RegasGroup produced separate reports for asbestos, lead, CAM 17 metals and Fire Residue. Presenting the data in multiple reports promotes an artificial separation of interrelated hazards that must be evaluated collectively to determine actual exposure risk and appropriate remediation scope.[52]

[52] **Exhibit L**

165. Kaizen's further report ultimately concluded that the Property "sustained irreversible, infiltrated-level contamination consistent with a large scale urban conflagration."[53]

166. Following the inspection by RegasGroup, and after Plaintiffs provided the Kaizen and Environmental Reports to Travelers, Travelers decided to hire two additional vendors to perform additional testing and inspections at the Property: JS Held and HygieneTech.

167. This decision only further delayed remediation work at the Property.

168. JS Held inspected the Property on March 27, 2026, and HygieneTech performed additional testing on or about May 19, 2026.

169. During the testing performed by HygieneTech at the Property, Plaintiff Rippberger felt disrespected and insulted by HygieneTech's President and CEO – Brian Daly – who Plaintiff Rippberger describes as condescending. As HygieneTech inspected the Property, Plaintiffs got the impression Mr. Daly was not there to conduct a genuine investigation but had already pre-determined what the conclusions would be as evidenced by the fact that none of the technicians wore any personal protective equipment despite prior findings of asbestos, lead, and air-borne toxins at the Property.

170. Plaintiffs were provided little details as to the nature of these additional inspections and testing.

171. On July 23, 2026, Plaintiffs asked for an update. Travelers responded that it was withholding information on the JS Held inspection because it was still waiting for updates from HygieneTech – but Travelers could not indicate when that report or the findings could be expected.

172. Then, on August 5, 2026, Travelers finally produced the HygieneTech report– which was dated July 23, 2026.

173. Also, notwithstanding Travelers' decision that testing was now warranted,

---

[53] *Id.*

it refused to reimburse Plaintiffs for the pre-cleaning testing they had sought and paid for out-of-pocket. It was only after months of back-and-forth communication that Travelers finally paid Plaintiffs $7,345.00 for pre-testing cleaning – less than 35 percent of the amount submitted.

174. And to date, Travelers maintains that the payment be issued from dwelling coverage under the Policy and not from investigation funds – thus further decreasing the amounts available to Plaintiffs pursuant to the Policy's defined coverages.

175. In short, Travelers knowingly and maliciously refused to conduct a full and fair investigation of Plaintiffs' smoke damage claims. Travelers is wrongfully refusing to provide coverage for the Property's smoke, soot, and ash contamination as required under California's "all loss by fire" standard. *See* Cal. Ins. Code §§ 2070–2071. Plaintiffs have hundreds of thousands of dollars in coverage available under the Policy that could, and should, be used to remediate the Property and restore it to a safe, pre-Fire condition.

176. Yet, Travelers has persisted in low-balling Plaintiffs even after the true extent of the damage had been disclosed to Travelers through the Kaizen and Environmental One Reports, and after Travelers had received comprehensive and detailed demolition, removal, and rebuild estimates from Plaintiffs.

### B. Plaintiffs Have Acted Cooperatively with Travelers and Worked Diligently to Facilitate the Advancement of their Claim; Travelers Has Repeatedly Failed to Timely Respond to Plaintiffs' Inquiries

177. From the outset of the claim, Plaintiffs have fully cooperated with Travelers.

178. Plaintiffs evacuated the Property on January 8, 2025 due to the imminent and extreme danger of the Eaton Fire. And just a few days later, on or about January 10, 2025, they timely filed their claim with Travelers.

179. Plaintiffs also diligently and promptly sought testing at the Property to inform themselves and Travelers of the necessary remediation work at the Property.

180. And when Travelers told Plaintiffs that such testing was not necessary or that it would not pay for it, Plaintiffs moved forward out of pocket to insure it was done.

181. On top of testing, Plaintiffs have regularly communicated with Travelers regarding their claim, providing information requested and asking questions of their own. In many cases, Travelers and its claim adjusters have simply ignored Plaintiffs' questions.

182. For example, leading up to and including July 2025, Plaintiffs asked Ms. Keaton a series of questions that Ms. Keaton refused to respond to. Her lack of communication grew so bad that Plaintiffs had no choice but to request that a new adjuster be assigned to their claim.

183. But the new adjuster – Joe Saxton – also ignored may of Plaintiffs' questions. For example, as discussed above, Plaintiffs were provided little details as to the nature of these additional inspections and testing by JS Held and HygieneTech.

184. On December 19, 2025; December 29, 2025; January 12, 2026; January 19, 2026; January 21, 2026; February 9, 2026; and February 18, 2026, Plaintiffs asked Travelers to clarify why it had determined additional testing was necessary, why Travelers was ignoring Plaintiffs' reports and doing its own testing, and how Travelers intended to review and incorporate the reports Plaintiffs provided with their own reports.

185. Despite these many requests, Mr. Saxton never provided a response.

186. More recently, on or about July 23, 2026, Plaintiffs' counsel wrote to the specific content adjuster for their claim – Carolina Gonzalez – asking for an update on the loss inventory for 1,842 items damaged by the Eaton Fire. This loss inventory was submitted to Travelers back in March 2026.

187. Specifically, Plaintiffs communicated to Travelers seeking a coverage determination for the items and indicating they wanted to dispose of the items still inside the Property in order to move forward with remediation and rebuilding work on the property.

188. Even though Travelers had had more than 3 and half months since the loss inventory was submitted to inspect the items, Plaintiffs offered Travelers another opportunity to inspect the contents prior to their removal/disposal.

189. Initially, on July 28, 2026, Plaintiffs were told by Travelers that there had

been no progress on a contents determination because it was waiting on the HygieneTech report – which had already been written by this time.[54] Further, Travelers asked if Plaintiffs would accommodate an inspection date only a few days later on July 31, 2026 – or sometime the following week – and warned Plaintiffs that any disposal of the items before an inspection would work against Plaintiffs' recovery.

190. As such, notwithstanding the short notice, Plaintiffs were willing to accommodate the request.

191. Despite their willingness and response, Travelers ended up saying a July 31 inspection date would no longer work and that another time would need to be scheduled.

192. Then, on August 4 and 6, 2026, Travelers communicated to counsel for Plaintiffs that an inspection was not warranted after all, and that Plaintiffs could dispose of the items.

193. Had Plaintiffs known they could have disposed of the items months earlier, they would have done so and could have begun remediation and repair work at the Property.

194. Travelers also made an initial payment around this time on the personal property contents portion of Plaintiffs' claim for services rendered by Archive Restoration.

195. In conjunction with the initial payment, Travelers told Plaintiffs to provide the age and condition of the items, which Travelers needs to complete valuation of the contents. This was a monumental effort for more than 1,842 items, and Travelers offered no explanation why it did not request that Plaintiffs complete this information four months ago when the loss inventory was submitted and while the parties were waiting on the HygieneTech report.

196. Ultimately, the completion of this valuation took Plaintiffs approximately

[54] Based on the date of the report, Travelers already had the report when it indicated it was still waiting on the results.

31 hours to complete, and required Plaintiffs to take 13 hours of paid-time-off.

197. All of the foregoing reflect significant and unnecessary delays on Travelers' part that prevented movement on a resolution of Plaintiffs' claim.

198. In other instances, Travelers accused Plaintiffs of withholding estimates and refusing to submit them for review, which is categorically and blatantly untrue. Any review of those estimates and the dates they were sent will clearly show Plaintiffs provided those estimates to Travelers as they received them.

199. In short, throughout this process, Plaintiffs acted cooperatively with Travelers to facilitate the advancement of their claim. Travelers has not reciprocated those efforts.

a. **Travelers' Claim Mishandling of Plaintiffs' Claim Has Caused Substantial Mental, Physical, Emotional, and Financial Harm to Plaintiffs**

200. Pursuant to the Policy and California law, Travelers' objective in handling Plaintiffs' claim should have always been to assist Plaintiffs in returning the Property to its pre-loss condition within the limits of the Policy and within a reasonable timeline.

201. Travelers has not met this objective. Quite the contrary. The combined results of the Kaizen, Environmental and the RegasGroup Reports (even with the RegasGroup's significant limitations and inherent inadequacies), indicate a pervasive presence of toxic Fire-related materials in the air, on surfaces, and absorbed into the materials of the Property and Plaintiffs' personal property therein. These toxic materials will cause irreparable and irreversible harm to Plaintiffs' family if they are not properly mitigated. The long-term consequences of exposure to these smoke and toxins cannot be overstated. For instance, chromium exposure is known to cause cancer in humans and lithium exposure can damage the kidneys.

202. To return the Property to pre-loss condition, the full ensemble of findings must be considered. Instead, however, Travelers wrongly seeks to use the RegasGroup Report in an effort to diminish the documented damages to the Property and improperly

limit the scope of repairs. The Kaizen Report makes clear that drywall, flooring, porous materials, personal property (other than glass and metals), electronics, and related contents must be completely removed in order to mitigate the hazards to Plaintiffs.

203. At all times relevant hereto, the Policy required Travelers to conduct a prompt and reasonable investigation, to provide written notice of acceptance or denial of the claim within a reasonable time after receipt of proof of loss, and to pay covered amounts within thirty (30) days of receipt of proof of loss where conditions for payment were met, as set forth in the Policy and applicable California law. Instead of complying with these obligations, Travelers delayed and obstructed the claims process and worked in concert with its biased vendor, RegasGroup, to minimize, delay, and deny coverage owed to Plaintiffs, in bad faith and in conscious disregard of Plaintiffs' rights.

204. Travelers has acted in reckless disregard for Plaintiffs and their rights under the Policy.

205. Under the Policy and California law, Plaintiffs are entitled to full and comprehensive remediation of the Property, full reimbursement of pre-remediating testing at the Property, as well as post-remediation clearance testing performed by an independent third party. Such remediation and clearance testing are required to ensure that the Property is safe, habitable, and restored to its pre-loss condition, and to satisfy the insurer's duty to conduct and diligently pursue a reasonable, thorough, fair, and objective investigation of Plaintiffs' claim before requiring or pressuring Plaintiffs to reoccupy the Property.

206. Travelers' handling of Plaintiffs' claim has been marked by, among other problems, failure to communicate in a timely manner, unreasonable delays, failure to timely reimburse for agreed-upon expenses, refusal to reimburse expenses, collaboration with dishonest and unethical vendors like RegasGroup, and failure to timely affirm or deny coverage and pay benefits consistent with the Kaizen Report findings and the Policy's coverage provisions.

207. As a direct and proximate result of Travelers' willful and wanton delay and

underpayment of the coverage to which Plaintiffs are entitled under the Policy, Plaintiffs have incurred other substantial out-of-pocket expenses related to inspections, environmental testing, and prolonged alternative housing.

208. Some of these costs and expenses include, but are not limited to:

- Around $22,268.10 for hygienist and contamination testing at the Property by Kaizen
- Around $2,450.00 for asbestos testing by Environmental One
- Around $3,100.00 for a second vehicle to facilitate the increased commute to work because of the location of the ADU
- Around $3,450 to date for ongoing marriage counseling necessitated by the extreme stress caused to Plaintiffs by Travelers
- Around $175 for the appraisal of the Turkish rug
- Around $1,794 (and increasing) to date for medication

209. Furthermore, because of Travelers' delays as alleged herein, Plaintiffs will soon also have to absorb overlapping rent, transportation costs, and unreimbursed loss of use expenses. Travelers knows Plaintiffs are running out of ALE and that once they do, they will be in a much more vulnerable, desperate position having to cover both rent and mortgage. Yet, Travelers seems unbothered by Plaintiffs' predicament, perfectly content running out the clock with its delays.

210. Plaintiffs have lost earning potential and time they would have otherwise devoted to advancing their careers and other important life pursuits. As a result of Travelers' prolonged and unnecessary claims handling, Plaintiffs were required to use vacation days to meet with contractors and address insurance-related issues. Plaintiffs also lacked the time and capacity to make up lost work in the evenings due to the extended, burdensome, and avoidable demands imposed by Travelers' conduct.

211. Plaintiffs have experienced persistent anxiety and high levels of stress and depression as a direct result of Defendants' claim mishandling. Repeated inconsistent

communications, ignored correspondence, and sham "testing" by RegasGroup and other entities caused the claim process itself to become a significant source of harm.

212. All of the foregoing caused Plaintiffs to use a lot of sick time for mental health reasons related to the stress of dealing with Travelers.

213. Plaintiff Rippberger went on medical leave from July 29 to August 29, 2025 for approximately five weeks as a result of the stress and anxiety caused by having to deal with Travelers and manage the claim, which itself has become unending and relentless, taking a toll on all aspects of Plaintiffs' lives.

214. While she was on leave, Plaintiff Rippberger could not make her full salary. Medical leave benefits pay does not kick in for the first 7 days of leave, so to mitigate Plaintiff Rippberger's income losses she used up 18.5 hours of paid-time-off to cover that time and to "top off" her medical leave pay.

215. In addition to using up sick and vacation time, she still made less money because medical leave benefits only cover a portion of one's income.

216. In short, during this time, Plaintiff Rippberger lost approximately $1,500.00 plus 18.5 hours of paid-time-off.[55]

217. Before the Eaton Fire, Plaintiffs maintained an active and stable daily routine, including walking to work each morning and engaging in regular exercise and contributed to Plaintiffs' overall health and quality of life. But after the fire, Plaintiffs have not been able to maintain the same active, healthy lifestyle.

218. Because the space at Plaintiffs' temporary accommodations is so limited, they cannot store any of their physical- or hobby-related items, such as a drum kit, rock climbing gear, bicycles, baking equipment, camping gear, ski equipment, or weightlifting equipment.

219. Also, because the temporary accommodations do not belong to them,

[55] This does not include the additional 13 hours of paid-time-off that Plaintiffs had to take to complete the total loss report for the more than 1,842 items.

Plaintiffs cannot garden or engage in other activities at the residence that would provide them both joy, a sense of normalcy, and physical exercise.

220. Plaintiff Sturm has gained 50 pounds since the fire – and is currently his heaviest weight ever by approximately 30 pounds. And he has gone from not having to take any medications, to (i) Lexapro; (ii) Lorazepam; (iii) Hydroxyz Hcl; (iv) Semaglutide-wegovy; and (v) Atorvastatin.

221. Returning to their home in a timely manner as they should have been able to do but for Travelers' claim mishandling would have resolved a major source of the prolonged and ongoing trauma they have endured. Instead, Travelers' continued delay has prolonged uncertainty, displacement, and distress. As a direct result of Travelers misconduct, Plaintiffs have required mental health therapy, and they have incurred therapy-related copayments totaling more than $3,450.

222. Further, after the Eaton Fire, Plaintiff Sturm fell into a deep depression that later turned into suicidal ideation as the thought he was not going to return to his home anytime soon became a reality. This increased depression and suicidal ideation kept Plaintiff Sturm from being in the right state to assist Plaintiff Rippberger in dealing with Travelers and insurance-related matters – only further increasing her mental health related issues.

223. Plaintiff Sturm now requires psychiatric support.

224. Plaintiff Rippberger attends monthly fire survivor meetings and now meets with a therapist twice a week following the fire.

225. For the first time in their 18-year marriage, Plaintiffs require couples' counseling to support their relationship through the prolonged high stress of dealing with the insurance company and remaining displaced. This counseling is an additional, out-of-pocked expense not covered by their insurance.

226. The cumulative effect of the mental, physical, emotional, and financial stressors Plaintiffs experienced as a direct and proximate result of Defendants' willful, wanton, and reckless misconduct, carried out in conscious disregard of Plaintiffs' rights,

has significantly diminished Plaintiffs' quality of life and caused substantial harm. These damages were foreseeable, preventable, and directly caused by Defendants' failure to timely and fairly adjust Plaintiffs' claim and permit Plaintiffs' safe return home to the Residence.

## FIRST CAUSE OF ACTION

### Insurance Bad Faith

### Against Defendant Travelers and Doe Defendants

227. Plaintiffs repeat and incorporate by reference each and every preceding paragraphs of this Complaint as though fully set forth herein.

228. Plaintiffs are, and at all relevant times were, the owner and occupants of the Property.

229. Plaintiffs purchased the Policy and the Policy was in full force and effect at all relevant times herein.

230. Plaintiffs fully satisfied all conditions precedent under the Policy for payment of insurance benefits at issue.

231. Despite Plaintiffs timely notifying Travelers (i.e., Travelers Company and Standard Fire) of the covered losses resulting from the Fire and other perils covered by the Policy, Travelers has: (a) failed to conduct a fair, objective, and thorough investigation of Plaintiffs' claim; (b) placed unduly restrictive interpretations on the Policy terms and statutory requirements; (c) failed to give Plaintiffs' interests equal consideration with its own, and specifically, failed to consider the detriment to Plaintiffs based on the damages sustained as a result of the Fire; (d) failed to investigate or even question the accuracy of the estimates and reports, or the quality of work provided, from its preferred vendors, including but not limited to RegasGroup; (e) worked in concert with vendors, like RegasGroup and HygieneTech, to support its predetermined objective to undervalue and underpay Plaintiffs' claim and to deny Plaintiffs the coverage they are entitled to receive under the Policy; (f) failed to timely reimburse Plaintiffs; (g) failed to provide written explanations to Plaintiffs for the basis of claim settlements or payments;

(h) misrepresented language in the Policy in order to withhold benefit and delay the receipt of funds; and (i) compelled Plaintiffs to institute litigation to recover amounts legally due under the Policy.

232. Travelers' conduct was intended to and did, vex, damage, annoy and injure Plaintiffs. Travelers' conduct was intentional, willful and in conscious disregard of Plaintiffs' rights and was malicious, oppressive and fraudulent under California Civil Code § 3294, thereby entitling Plaintiffs to punitive and exemplary damages against Travelers.

233. As evidence of Travelers' unreasonable, malicious, fraudulent, and oppressive conduct toward Plaintiffs, Travelers' failure to investigate and failure to pay amounted to unfair and unlawful prohibited acts pursuant to California Insurance Code §§ 790.03(h), 2051, 2070, 2083, and 10 CCR § 2695.1 *et seq.*

234. As a direct and proximate result of Travelers' conduct, Plaintiffs have had to retain attorneys to enforce their right to the insurance coverage to which they are entitled under the Policy and have thereby been injured and damaged.

235. Plaintiffs therefore are entitled to recover and seek in connection with this cause of action: (a) an award of general damages and other monetary damages, including all foreseeable, consequential and incidental damages for diminution in value, loss of use, and other incidental damages and out of pocket expenses, including interest, in an amount to be determined at trial; (b) punitive and exemplary damages in an amount to be determined at trial; (c) Plaintiffs' costs of suit; and (d) Plaintiffs' reasonable attorneys' fees in connection with this action.

## <u>SECOND CAUSE OF ACTION</u>

### Breach of Contract

### Against Defendant Travelers and Doe Defendants

236. Plaintiffs repeat and incorporate by reference each and every preceding paragraph of this Complaint as though fully set forth herein.

237. Travelers (i.e., Travelers Company and Standard Fire) breached the Policy

in that it: (a) failed to conduct a fair, objective, and thorough investigation of Plaintiffs' claim; (b) placed unduly restrictive interpretations on the Policy terms and statutory requirements; (c) failed to give Plaintiffs' interests equal consideration with its own, and specifically, failed to consider the detriment to Plaintiffs based on the damages sustained as a result of the Fire; (d) failed to investigate or even question the accuracy of the estimates and reports, or the quality of work provided, from its preferred vendors, including but not limited to RegasGroup; (e) worked in concert with vendors, like RegasGroup and HygieneTech, to support its predetermined objective to undervalue and underpay Plaintiffs' claim and to deny Plaintiffs the coverage they are entitled to receive under the Policy; (f) failed to timely reimburse Plaintiffs; (g) failed to provide written explanations to Plaintiffs for the basis of claim settlements or payments; (h) misrepresented language in the Policy in order to withhold benefit and delay the receipt of funds; and (i) compelled Plaintiffs to institute litigation to recover amounts legally due under the Policy.

238. Travelers' conduct or lack thereof violated the Policy, including statutory requirements under California law.

239. As a direct and proximate result of Travelers' breach of the Policy, Plaintiffs sustained a loss of Policy benefits in an amount to be determined in accordance with the evidence admitted at the trial of this matter.

## THIRD CAUSE OF ACTION

**Violation of California Business and Professions Code § 17200 *et seq.***

**Against Defendant Travelers and Doe Defendants**

240. Plaintiffs reallege and incorporate by reference each and every preceding paragraph of this Complaint as though fully set forth herein.

241. California Business and Professions Code § 17200, *et seq.* (the "Unfair Competition Law" or "UCL") prohibits unlawful, unfair, and fraudulent business practices. Each of these three prongs constitutes a separate and independent basis for liability. By engaging in the above-described conduct, Travelers (i.e., Travelers Company

and Standard Fire) has acted in a manner that is unlawful, unfair, and fraudulent, and they have thus engaged in unfair business practices to the extreme detriment of Plaintiffs, which is conduct prohibited under the UCL.

242. Travelers engaged in unlawful business acts and practices by, among other things, violating the following statutes and regulations, including but not limited to:

a. By failing to timely respond to communications from claimants and/or timely accept or deny claims (California Code of Regulations, Title 10, §§ 2695.5(b) and 2695.7(b));

b. By misrepresenting policy language and the terms and scope of coverage to Plaintiffs (California Insurance Code § 790.03(h)(1); California Code of Regulations, Title 10, § 2695.4(a));

c. By failing to adopt and implement reasonable standards for the prompt investigation and processing of claims, and by not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability had become reasonably clear (California Insurance Code § 790.03(h));

d. By falsely advertising and misrepresenting to Plaintiffs and the public that its Policies and claims handling practices are compliant with California law as well as fair, prompt, simple, and complete, when Travelers knew such statements were false and misleading, or should have known through the exercise of reasonable care that such statements were false and misleading, in violation of California Business and Professions Code § 17500 *et seq.* and California Civil Code § 1750 *et seq.*;

e. By failing to disclose repair, remediation, and/or testing reports upon Plaintiffs' request in violation of its obligation to disclose such documents within 15 calendar days of a request (California Insurance Code § 2071); and

f. By refusing to pay for testing for or otherwise reasonably investigate claims of smoke damage (California Code of Regulations, Title 10, § 2695.7(d); California Insurance Code § 790.03(h)(5)); and

243. Each of the above violations constitutes an "unlawful" business act or practice under the UCL.

244. Travelers' conduct also constitutes "unfair" business practices within the meaning of the UCL. Travelers' actions offend public policy, are immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers that is not outweighed by any countervailing benefit.

245. Specifically, Travelers has engaged in a pattern and practice of deliberately under-investigating and denying legitimate claims, including Plaintiffs', by misapplying unlawful policy provisions, delaying claim resolution without justification, denying benefits based on pretextual grounds, and failing to provide coverage (such as competent and comprehensive independent certified industrial hygienist assessment of the Property and Loss of Use) that Plaintiffs are entitled to receive under the Policy.

246. The harm to Plaintiffs and the public from such practices is significant and far outweighs any potential utility or justification.

247. Travelers' conduct also constitutes fraudulent business practices in violation of the UCL. A practice is "fraudulent" under the UCL if it is likely to deceive a reasonable consumer.

248. Travelers engaged in fraudulent conduct by:

a. Making false advertisements and misrepresentations to Plaintiffs and the general public that Travelers policies provided coverage that complied with California law, when in fact they do not, and that claims handling would be conducted in a fair, prompt, and complete manner, when in fact it is not, and Defendants knew or should have known such statements were false and misleading;

b. Representing to Plaintiffs that Plaintiffs' claim would be fairly

investigated and paid under the Policy, when in fact Travelers had predetermined to deny claims like Plaintiffs' based on unlawful restrictions;

c. Failing to disclose or provide Plaintiffs the full coverage available to them under the Policy;

d. Making coverage and loss valuation decisions and determinations based on inaccurate reports from untrustworthy and incompetent professionals; and

e. Providing claim denial letters and/or unlawfully and wrongfully delaying claim decisions that ignored the evidence Plaintiffs submitted, creating a false appearance of legitimate consideration and review.

249. A reasonable consumer in Plaintiffs' position would be deceived by Travelers' representations and omissions.

250. Plaintiffs suffered injuries in fact and lost money and/or property as a result of Travelers' unfair, unlawful, and fraudulent business practices, including but not limited to: Premium payments for purported coverage and claim handling represented and advertised to be fair, prompt, complete, and compliant with California law when it is not; unpaid insurance benefits, out-of-pocket costs, lost time and income, and physical, mental, and emotional distress.

251. Travelers' wrongful business practices as alleged herein are entrenched in the manner in which they conduct business with Plaintiffs, their policyholders, and the general public, both in their day-to-day operations and in the administration of claims. The UCL claim is directed at these broader, systemic business practices, not merely the handling of Plaintiffs' particular claim or any other particular claim. Because the challenged conduct is ongoing and deeply rooted in Traveler Company's and Standard Fire's business practices, it is appropriately remedied through restitution and injunctive relief under the UCL.

252. Plaintiffs seek restitution, including restitution of premium payments for the Policy (Plaintiffs paid premiums for purported coverage and claims handling represented and advertised to be fair, prompt, complete, and compliant with California law, but due to Defendants' wrongful practices received no such meaningful coverage or benefit).

253. Plaintiffs seek all available remedies under the UCL, including but not limited to restitution as described above, private and public injunctive relief prohibiting Travelers from continuing its unlawful practices, and an award of attorneys' fees under California Code of Civil Procedure § 1021.5. The unfair, unlawful, and fraudulent business practices of Travelers described herein present a continuing threat to Plaintiffs and members of the general public in that Travelers persists and continues to engage in these practices and will not cease doing so unless and until forced to do so by this Court. Travelers' conduct is causing, and will continue to cause, irreparable injury to Plaintiffs and the public unless enjoined or restrained. Plaintiffs seek forward-looking relief that is oriented to and for the benefit of not only themselves, but also the benefit of the general public, that will protect consumers from Travelers' ongoing practice of unlawful, unfair, and fraudulent claims mishandling as described herein.

254. Plaintiffs lack an adequate remedy at law for Travelers' ongoing unfair business practices. Damages available under Plaintiffs' legal claims cannot fully address the wrongful business practices alleged herein, which are systemic to the manner in which Travelers Company and Standard Fire conduct business on a day-to-day basis, nor can they prevent future misconduct affecting Plaintiffs and other insureds. The equitable relief requested herein is not duplicative of Plaintiffs' legal remedies, is uniquely available to them under the UCL, and is necessary because damages alone cannot provide complete relief or make Plaintiffs whole.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment for themselves as individuals and co-trustees of the Trust as follows:

(1) Awarding general and/or special damages determined according to

proof;

(2) Awarding punitive and exemplary damages;

(3) Awarding pre-judgment interest, and all other interest to which Plaintiffs are entitled;

(4) Awarding post-judgment interest, according to proof;

(5) Awarding injunctive relief, and public injunctive relief, as claimed herein or as the Court may deem proper;

(6) Awarding declaratory relief;

(7) Awarding restitution;

(8) Awarding reasonable attorneys' fees incurred in this action;

(9) Awarding costs of suit; and

(10) Awarding any and all other and further such relief as the Court shall deem proper, all according to proof.

**JURY TRIAL DEMAND**

Plaintiffs, by themselves as individuals and co-trustees of the Trust, hereby demand a trial by jury on all issues so triable.

Dated: September 9, 2026

SINGLETON SCHREIBER, LLP

By: 

Michelle M. Meyers
Attorneys for Plaintiffs

**VERIFICATION OF COMPLAINT AND DEMAND FOR JURY TRIAL**

I, Ellen Rippberger , have read the attached VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL and know its contents.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on 09/04/2026 in Altadena, California.

Ellen Rippberger

Ellen Rippberger

The signed document can be validated at https://app.vinesign.com/Verify

**VERIFICATION OF COMPLAINT AND DEMAND FOR JURY TRIAL**

I, Erick Sturm, have read the attached VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL and know its contents.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on 09/08/2026 in Altadena, California.

Erick Sturm

Erick Sturm

The signed document can be validated at https://app.vinesign.com/Verify